NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 20, 2022

S22A0757.  LEWIS v. THE STATE.

WARREN, Justice.

After a jury trial in May 2011, Didrekeus Lewis was convicted of malice murder and other crimes for the shooting death of Marvin Printup.[1]  Lewis raises five claims of error on appeal: (1) that the

_____

[1] On July 1, 2011, a Fulton County grand jury indicted Lewis for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on possession of a handgun by a convicted felon (Count 3), aggravated assault with a deadly weapon (Count 4), aggravated battery (Count 5), possession of a firearm during the commission of a felony (Count 6), and possession of a firearm by a convicted felon (Count 7).  After a trial from March 5 to 7, 2012, a jury found Lewis guilty on all counts.  On March 15, 2012, Lewis was sentenced to serve life in prison for malice murder, 15 years for aggravated battery, and 5 years for use of the gun during the commission of a felony, with the sentences to run consecutively.  Although the trial court purported to merge the felony-murder counts, they were actually vacated by operation of law.  See *Malcolm v. State*, 263 Ga. 369, 372 (434 SE2d 479) (1993).  The trial court also appeared erroneously to merge the count for possession of a firearm by a convicted felon into the malice murder count.  See *Smith v. State*, 300 Ga. 532, 537 (796 SE2d 671) (2017).  But "when a merger error benefits a defendant and the State fails to raise it by cross-appeal," we "exercise our discretion to correct the error upon our own initiative only in exceptional circumstances," *Dixon v. State*, 302 Ga. 691, 698 (808 SE2d 696)

evidence was insufficient to support his convictions; (2) that the trial court erred when it denied Lewis's motion to suppress evidence that Yvette Varner identified a man in a photo lineup as "Weasel"; (3) that the trial court erred when it denied Lewis's motion for mistrial made after a detective summarized a pre-trial statement from a witness, Abdul Aziz, that the trial court had ruled was inadmissible before trial; (4) that the trial court erred by denying Lewis's motion to suppress evidence that Aziz identified a man in a photograph as "Weasel"; and (5) that Lewis received ineffective assistance of counsel.

We conclude that the evidence is sufficient to support Lewis's convictions; that the trial court did not abuse its discretion in concluding that the photograph shown to Varner was not impermissibly suggestive; and that Lewis's claim that the trial court

(2017), and we decline to do so here. In addition, the count for assault with a deadly weapon merged with the malice murder count. Through trial counsel, Lewis filed a timely motion for new trial on March 26, 2012. Through new counsel, Lewis filed an amended motion for new trial on June 1, 2018. On January 23, 2019, following a hearing on Lewis's motion for new trial, the trial court denied Lewis's motion. On February 7, 2019, Lewis filed a timely notice of appeal. The case was docketed in this Court to the April 2022 term and submitted for a decision on the briefs.

abused its discretion in denying his motion for mistrial is without merit. We also conclude that Lewis's claim that the trial court erred in failing to suppress Aziz's identification of a man in a photograph as Weasel is waived because Lewis failed to obtain a ruling on the issue at a pre-trial hearing and did not object to the evidence at trial. Finally, trial counsel was not constitutionally deficient in failing to object at trial to the photographic lineup shown to Varner; by failing to object to the photograph of Lewis shown to Aziz; or by failing to make a meritless objection about the prosecutor's closing argument. We therefore affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Lewis's trial showed the following. Varner rode with Marvin Printup to a gas station on Martin Luther King, Jr. Drive at approximately 4:00 a.m. on September 11, 2010. Varner testified that she and Printup, who was also known as "Kool-Aid," went to the gas station to "pick up [her] friend" Paul Sadeghy.[2]

---

[2] In his opening statement, the prosecutor said that Paul Sadeghy was out of the country at the time of trial. Paul did not testify at trial.

3

Varner testified that she went into the convenience store, where she saw Paul arguing with someone. Varner added that she did not know who he was arguing with, but when asked whether she had previously told a detective that Paul was arguing with a person she knew as "Weasel," Varner said, "Yes. I think so." Shortly thereafter, however, she testified that "I ain't going to say Weasel. Weasy, maybe, but not Weasel. Something like that. I think it is Weasy." The prosecutor then asked Varner if she had told a detective that she had known "Weasel" all of his life. Varner testified that "that's just a thing that I say. I do drugs a lot, and I just say that just to get, you know, what I'm trying to get." According to Varner, Printup came into the store and "started arguing" with the "guy that Paul was arguing with." When asked what happened next, Varner testified that "I really can't remember. I remember seeing this guy that was going out the store, and I hugged him, and [said] I hadn't seen you in a long time." Varner added that the "guy" was "Weasel"; that he was the person that Paul and Printup were arguing with; that the argument "was all about money with Paul and Weasel"; and

4

that "[a]fter that, there was a lot of arguing, and me and Paul was going towards the car. I heard a lot of shooting." According to Varner, she heard "about three, no more than four shots." Varner added that she and Paul got "in the car with Bobby, and . . . left." Bobby was a friend of Varner's who arrived at the gas station just before the shooting. Varner also testified that she was with Printup all day and did not see him with a gun and that, after the shooting, Weasel left the gas station in a green car.

During her testimony, Varner said that she could not remember whether Printup went back to the car with her and Paul to leave the gas station. She also testified that, although she heard a shooting, she did not see it and did not know who did the shooting. Moreover, in her testimony, Varner did not identify Lewis as "Weasel" or "Weasy." The State, however, introduced into evidence two prior statements that Varner made to police officers in which she described seeing Printup being shot by "Weasel" at his car and in which she identified Lewis as Weasel. In a written statement made within a week of Printup's shooting, Varner said the following.

5

On Friday, Paul called me to get him from the Citgo at MLK. I went up there with Kool-Aid. Paul said that Weasy . . . was the shooter, wanted Paul to buy drugs from him and pay him for a ride. Paul was geeking and in the store waiting. I told him to come on. He was still arguing with the shooter. We got in the car, and this is when Kool-Aid and Weasy started arguing over Weasy owing Kool-Aid $25 for giving him a ride to court earlier in the week. Kool-Aid was mad that he didn't get paid and argued with Weasy. At this point, Kool-Aid reached acting like he had a gun to scare Weasy off. Weasy did pull a gun and shoot Kool-Aid.

Varner also made a videotaped statement with the help of a different detective, and in that statement, said that Printup "was taking the pump off his car and putting it back in . . . and . . . Paul came on out still arguing, going towards Kool-Aid's car." She added that

I made Paul get in the back seat and sit down. Then Kool-Aid acted like he had a gun. He came all the way behind his car over there where me and Weasel was at to argue with him like he got a gun. Why is he doing that? I don't know. But then he just got down; said f**k you, n*****. F**k you. And he was fixin' to get ready to get in the car, and Weasel just started shooting, and he just started running towards, and he just ducked down, started running towards the door of the gas station.

In that videotaped statement, Varner also described Weasel, saying

that he was "approximately 5 foot 5, 5 foot 6 in height," "with a light brown complexion," and "a tattoo somewhere on his face."

During her videotaped statement, Varner also identified a photograph of Lewis, explaining that he was the person she knew as "Weasel" and said that she had known Weasel "all his life." The State also introduced other evidence that "Weasel" was Lewis. In this regard, Aziz, who was working as the manager of the gas station on the night of the crimes, testified at trial that he did not remember identifying a photograph shown to him by a detective as a person he knew as "Weasel." However, a detective testified that, after Printup's shooting, he showed a photograph of Lewis to Aziz and Aziz identified the person in the photograph as being a person that he knew as "Weasel."[3] The detective added that Aziz told him that "Weasel" came to the store several times a night.

The State also introduced surveillance video from the gas station that was recorded on the night of Printup's shooting.

_____

[3] At trial, Aziz testified that he was in the back of the store at the time of the crimes, and he offered no testimony about the argument that Lewis had with Paul and Printup or about the shooting.

7

Although no witness at trial identified the people shown in it, the video depicted an altercation that corresponded to the altercation Varner described in her trial testimony and prior statements to detectives, culminating with a man who was wearing a white t-shirt shooting another man by a car parked near a gas pump. A responding police officer testified that he found four shell casings by the gas pump where the shooting occurred.

The computer aid dispatch ("CAD") report for the 911 call that followed Printup's shooting was introduced into evidence at trial. The custodian of records for the 911 call center for the City of Atlanta Police Department testified that a CAD report "gives you all the information that the callers give the 911 taker on that call when they call in." She added that the CAD corresponding to the 911 call from the gas station on the night of Printup's shooting contained a description of the shooter as a "light skinned, late 20-year-old," wearing a "white t-shirt," and having a "tattoo under eye." The report also said that the shooter left the scene in a "gold or green vehicle."

Printup suffered a gunshot wound to the abdomen, which caused multiple injuries to his abdominal cavity, including injuries to his intestines and pancreas. After a seven-month hospitalization, Printup eventually went into septic shock and died. A treating physician testified that Printup would not have died had he not been shot at the gas station. In addition, the medical examiner who performed Printup's autopsy testified that the cause of death was "delayed complications of [a] gunshot wound to the torso."

In addition to the evidence recounted above, a recording of a phone call that Lewis made from jail to his girlfriend was admitted into evidence at trial. On the phone call, Lewis says "they don't have nothing on me if they are looking for that b***h Sweet Meat," referring to Varner by her nickname. He also expressed worry about whether law enforcement had obtained video footage from the gas station. During that call, Lewis referred to himself as "Weasel."

2. Lewis contends that the evidence was legally insufficient to support his convictions. We disagree.

"When evaluating a challenge to the sufficiency of the

evidence" as a matter of constitutional due process, "we view all of the evidence presented at trial in the light most favorable to the verdict[s] and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979)). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts," *Smith v. State*, 308 Ga. 81, 84 (839 SE2d 630) (2020), and we do not "reweigh the evidence," *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019) (citation and punctuation omitted).[4]

---

[4] We note that we initially returned the entire record in this case to the trial court because two exhibits—the surveillance video and the recording of Lewis's phone call from the jail—did not properly function and were thus unreviewable. The trial court later re-filed the record with this Court again, with the two exhibits submitted in a condition that allowed them to be reviewed. Lewis contends that we may not consider these exhibits in determining the sufficiency of the evidence because the chain of custody of the exhibits was "compromised." But Lewis does not contend that the two exhibits have been modified or are somehow incorrect or inaccurate. And if he thought that they were, he could have sought to remedy the problem in the trial court, but did not do so. See OCGA § 5-6-41 ("If anything material to either party is

10

We conclude that there is ample evidence from which the jury could have "found [Lewis] guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jones*, 304 Ga. at 598. To begin, there was evidence, including statements from Varner, Aziz, and Lewis, from which the jury could infer that the person that Varner and Aziz referred to as "Weasel" or "Weasy" was Lewis. Moreover, Varner testified that the person she knew as Weasel was arguing with Paul and Printup at the gas station before Printup's shooting and later identified a photograph of Lewis as the "person who committed the crime." Varner also testified that she has known "Weasy" for a long time and hugged him when she saw him in the gas station parking lot. And in both Varner's written and videotaped statements, she said that she observed the shooting and that "Weasy" or "Weasel" was the shooter. Furthermore, the jury

omitted from the record on appeal or is misstated therein, the parties by stipulation, or the trial court, either before or after the record is transmitted to the appellate court, on a proper suggestion or of its own initiative, may direct that the omission or misstatement shall be corrected."). Accordingly, we ascertain no reason we cannot consider the two exhibits in question as part of the record on appeal in evaluating the sufficiency of the evidence.

heard a recording of a phone call Lewis made from jail where he expressed concern about whether law enforcement had a "tape" of the shooting. Finally, the CAD report matched Varner's physical description of Lewis, whom she identified as the shooter, and the surveillance video supports Varner's story of how the crimes occurred that night.

Although Lewis is correct that Varner provided conflicting testimony at trial about whether she recalled the shooting and the events surrounding it and about whether Weasel was the shooter, it "was for the jury to assess the credibility of the witnesses" and "to resolve any discrepancies in the evidence presented at trial." *Smith*, 308 Ga. at 85. We conclude that, viewing the evidence presented at trial in the light most favorable to the verdicts, the evidence was sufficient for the jury to have found Lewis guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jones*, 304 Ga. at 598.[5]

---

[5] Contending that the "verdict in this case is contrary to evidence and the ends of justice," Lewis also asks this Court to act as the "thirteenth juror"

3. Lewis contends that the trial court committed reversible error when it failed to grant Lewis's motion to suppress evidence that Varner identified a photograph of Lewis from a photographic lineup as the person she knew as Weasel because the lineup was unduly suggestive and because Varner admitted that she was under the influence of drugs at the time of the identification. Lewis's contentions fail.

(a) As background, before trial, the trial court conducted a hearing on Lewis's motion to suppress evidence of Varner's identification of Lewis from a photo lineup. At that hearing, Detective Cooper testified that, using a photograph of Lewis, he searched a database for people with "similar physical characteristics" and put together a lineup consisting of photographs of Lewis and five other men. He added that, at the end of his interview of Varner, he showed her the lineup, but that before doing

---

and, presumably, to grant him a new trial. But a "thirteenth juror" argument is "not properly addressed to this Court as such a decision is one that is solely within the discretion of the trial court." *Smith v. State*, 300 Ga. 532, 534 (796 SE2d 671) (2017).

so, he told Varner that the group of photographs may or may not include a photo of the person who had shot Printup and that she "should only make an identification if you can do so." The detective also informed Varner that because "hairstyles, beards, and mustaches are easily changed, the photographs you are viewing may or may not depict the hairstyle or facial hair similar to that of the person who committed the crime"; that "photographs do not always depict the true complexion of a person," which "may be lighter or darker than shown"; and that she should "[p]ay no attention to markings or numbers appearing in any particular photograph." After finishing the admonition, Detective Cooper placed the lineup face-down in front of Varner and told her to turn the lineup over when she was ready. Cooper testified that "within 3 seconds at the most," Varner identified the photo of Lewis as depicting the person that she knew as Weasel and also commented that the men in the lineup "looked so much alike." Detective Cooper testified that he thought that Varner was certain of her identification and that she never repudiated it.

On cross-examination at the pre-trial hearing, Lewis asked Detective Cooper if he knew whether Varner was a crack addict and whether Varner appeared "to be under the influence" at the time of the identification. Detective Cooper testified that he did not have information that Varner was a crack addict and that she did not appear to be under the influence when she identified Lewis's picture from the photographic lineup. Detective Cooper added that he "was a homicide detective for 10 years, interviewed countless people, both under the influence of crack [and] narcotics"; that he had made "conscious decision[s] . . . not to interview someone because I do feel like they are under the influence of something"; and that based on his "experience and knowledge," he "did not feel that [Varner] was under the influence of anything at the time that [he] conducted the interview."

Detective Cooper acknowledged on cross-examination that Lewis has a "noticeable" tattoo on his face, but disagreed with defense counsel that there was a visible tattoo on Lewis's face in the photograph of Lewis used for the lineup. Detective Cooper testified

15

that he copied the photographic lineup in black and white, so that he could control the "lightness, the darkness, [and] the contrast," especially because "several of the people [in the lineup] ha[d] inflections or dark spots in their photographs." He continued by explaining, "That's why this, this photograph, you cannot visually tell what that is on [Lewis's] face." Defense counsel then said, "I'm going to put it to you that if you look at the photograph, there is a visible tattoo of a cross below the left eye of Mr. Lewis?" Detective Cooper responded that after looking at the photograph several times, he could not tell that Lewis had a tattoo, and agreed that no one else in the lineup had a tattoo on his face.

Lewis called Varner to testify at the suppression hearing. Varner testified that she uses "ridiculous" amounts of drugs "every day all day," mostly crack and "a little heroin." She added that she was "high" when she made her statement to Detective Cooper and identified the photograph of Lewis.

At the conclusion of the hearing, Lewis contended that the lineup was impermissibly suggestive because Lewis's photograph

16

was the only one of the six in the lineup in which the man in the photograph had a tattoo on his face and that there was a substantial likelihood of misidentification because Varner was high at the time she made the identification. The trial judge, however, explained,

> It is on video, and I have, I have looked at the lineup, the photo lineup, and that is not suggestive to me in any way; and it looks like a good lineup, and [Varner] doesn't look like she is absolutely trashed in that interview and doesn't – so that's what I observed.

In response, Lewis argued that "there [was] only one person in the photo lineup who has tattoos on his face." The trial court responded, "Well, I have looked at it. I can't tell. He has got something over here, but it could be a shadow. And, I mean, it speaks for itself." The trial court then denied Lewis's motion to suppress the photo lineup.

Later, when testifying at trial about the photo lineup, Varner testified that she "picked the first person [she] could see as close as [she] could get to, so anybody." Varner also testified that she picked Lewis's picture because he was the only person with a tattoo on his face.

(b) "If an out-of-court identification by a witness is so impermissibly suggestive that it could result in a substantial likelihood of misidentification, evidence of that out-of-court identification violates due process and is inadmissible at trial." *Westbrook v. State*, 308 Ga. 92, 99 (839 SE2d 620) (2020) (citation and punctuation omitted). "This Court employs a two-step process in examining a trial court's admission of identification evidence for error." *Bowen v. State*, 299 Ga. 875, 879 (792 SE2d 691) (2016). First, we decide "whether the identification procedure used was impermissibly suggestive." Id. "[A]n identification procedure is not impermissibly suggestive unless it leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is the equivalent of the authorities telling the witness, 'This is our suspect.'" *Westbrook*, 308 Ga. at 99 (citation and punctuation omitted). Second, if a trial court properly "concludes that the State employed an impermissibly suggestive pretrial identification procedure, the issue becomes whether, considering the totality of the circumstances, there was a substantial likelihood of irreparable

18

misidentification." *Curry v. State*, 305 Ga. 73, 76 (823 SE2d 758) (2019) (citation and punctuation omitted). If, however, a trial court properly determines that "the identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification." *Westbrook*, 308 Ga. at 99 (citation and punctuation omitted). "We review a trial court's determination that a lineup was not impermissibly suggestive for an abuse of discretion." Id.

Lewis contends that his identification should have been suppressed because the photograph of his face was the only one in the lineup with a tattoo, and because Varner testified at trial that she identified Lewis's picture in the photo lineup because it was the only one depicting a person with a tattoo on his face. But the record does not support the conclusion that the photo lineup was "impermissibly suggestive." See *Westbrook*, 308 Ga. at 99. To begin, Detective Cooper testified that he could not tell from Lewis's photograph that Lewis had a tattoo on his face. Likewise, even after examining Lewis's black-and-white lineup photograph, the trial

19

court concluded that it could not tell that there was a visible tattoo on Lewis's face, noting in reference to the photograph that "I can't tell. He has got something over here, but it could be a shadow." Moreover, the black-and-white photo lineup contained in the record on appeal does not contradict the trial court's finding on this point.[6] In fact, it shows that the photographs in the lineup at issue consist of Lewis and five other males of similar age, race, hairstyles, and facial features. And on this point, the record further shows that Detective Cooper read the standard admonitions to Varner, telling her, among other things, that she "should only make an

---

[6] In *Newton v. State*, 308 Ga. 863 (843 SE2d 857) (2020), in rejecting the defendant's claim that his photographic array was impermissibly suggestive, we noted that "[a]n appellant has the burden of proving trial court error by the appellate record," id. at 866 n.3, and said that "[t]he photographic array produced along with the record on appeal is a black-and-white copy (and not a good one) of the actual color array used for the lineup, so it is difficult for us to discern anyone's facial tattoos or skin tone." Similarly, here, the photographic lineup in the record is a not-so-good black-and-white copy of a black-and-white copy, making it difficult for us to determine if Lewis has a visible tattoo in the photograph used in the array. But given that it was Lewis's burden to prove trial court error using the appellate record, and given the trial court's express finding that it "couldn't tell" from the photographic lineup presented at trial whether Lewis had a tattoo on his face in the photo, we cannot say that the trial court was clearly erroneous on this point. *Tidwell v. State*, 312 Ga. 459, 464 (863 SE2d 127) (2021) (explaining that a trial court's factual findings on a motion to suppress must be upheld unless clearly erroneous).

identification if you can do so," "that photographs do not always depict the true complexion of a person," which "may be lighter or darker than shown," and that she should "[p]ay no attention to markings or numbers appearing in any particular photograph." Under similar circumstances, we have held that trial courts have not abused their discretion in denying motions to suppress identifications from photo lineups. See *Westbrook*, 308 Ga. at 99 (holding that the trial court did not abuse its discretion in denying a motion to suppress the defendant's identification by way of a photographic lineup, in part, because the lineup consisted "of six black males with similar hairstyles, with several of the males having a skin tone similar to [the defendant's] and all of the males having similar, short facial hair" and because the police officer gave the witness making the identification an admonition like that given by Detective Cooper in this case); *Blackmon v. State*, 300 Ga. 35, 38 (793 SE2d 69) (2016) (holding that an array consisting of "photographs of [the defendant] and five other males of similar age and with similar physical characteristics and facial features" was

21

not impermissibly suggestive).

Given all of the above, we cannot say that the trial court abused its discretion in concluding that the photographic lineup at issue was not impermissibly suggestive. See *Westbrook*, 308 Ga. at 99. And because we conclude that the photo line-up was not impermissibly suggestive, "it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification." Id.[7]

4. Lewis contends that the trial court erred by failing to grant Lewis's motion for a mistrial based on the State's introducing evidence that Lewis contends was ruled inadmissible at the motion

---

[7] Lewis notes that Varner testified that she was "high" at the time she made the identification of Lewis, and Lewis appears to contend—as he did at the hearing on the motion to suppress—that this factor is relevant to the issue of whether an impermissibly suggestive identification would have led to a substantial likelihood of misidentification. See *Blackmon*, 300 Ga. at 37 (holding that whether a witness was under the influence of intoxicants when making an identification "does not establish that the identification procedure was impermissibly suggestive," but instead "relates to the determination of whether there was a substantial likelihood of misidentification, an issue that arises only after a court determines the identification procedure was impermissibly suggestive"). However, because we need not reach the issue of whether there was a substantial likelihood of misidentification in this case, we also need not address Lewis's contention about Varner's use of potential intoxicants.

22

to suppress hearing. We disagree that the trial court abused its discretion by failing to grant a mistrial.

(a) The background relevant to this enumeration of error is as follows. At a pretrial hearing on Lewis's motion to suppress Aziz's identification of the photograph of Lewis as Weasel, Investigator Conner testified that he had obtained information that someone with the nickname of "Weezie" was a suspect in Printup's shooting. Investigator Connor also testified that Aziz told him that he knew a person with that nickname who frequented the gas station where Aziz worked and that that person was at the gas station "when the incident occurred," in reference to Printup's shooting. Over the course of several weeks, Conner showed Aziz a single photograph of three different men, none of which was Lewis, and Aziz said that none of those men were Weezie. However, about six weeks after the crimes, Conner showed Aziz a single photograph of Lewis, and Aziz identified the man in the photograph as Weezie. Investigator Conner also testified that Aziz told him that "he was present" on the night of Printup's shooting, "but he did not want his name in it. He

23

did not want to be involved in it, but he would, if I showed him photos of the person, he would tell me if I had the correct person." Investigator Conner added that he did not obtain a written statement from Aziz because Aziz "didn't want to be involved in it," but that Aziz told him that he saw what happened on the night of the crimes and that Weasel "was the person who shot Mr. Printup."

Aziz also testified at the hearing. He acknowledged that he was working at the gas station on the night of Printup's shooting, but said that he was in the back of the store and did not see what happened. Aziz also testified that he did not remember Investigator Conner showing him a photograph and did not remember identifying a person in a photograph as Weezie. The prosecutor then asked Aziz if he "remember[ed] telling [the prosecutor] and [his] investigator probably about . . . 20 minutes ago that you identified Weezie in a picture as being one of the people who was there that night." Aziz responded that he did not remember.

In responding to Lewis's motion to suppress Aziz's identification, the prosecutor argued that the one-person show-up

24

(i.e., Investigator Conner showing Aziz a single photograph of Lewis) would not have led to substantial likelihood of misidentification because Aziz had "the opportunity to view the criminal at the time." The trial court interjected that, "[w]ell, he said he didn't see it. He said he was in the back." The prosecutor responded that he "understood what [Aziz] said today" on the witness stand, but that "20 minutes ago he told my investigator and I something completely different." The trial court asked the prosecutor if Aziz had told the investigator he had "witnessed the crime." The prosecutor said, "no, and I wouldn't ask that. I'm not asking—I wouldn't ask at trial if he saw the shooting. What he said was the person who I picked out in that picture was there the night of the shooting." Later in the hearing the prosecutor again said that he was not going to ask Aziz whether he saw the shooting because "the officer clearly didn't put that in his report." The trial court then said,

> I mean [Aziz has] made no identification of anybody that shot anybody. The only reason you could call him—the only thing he could offer based on everything I've heard is that [Lewis], if he's known as Weezie, was, you know, at the location that day. . . . The only possible narrow way

25

you could call him is for him to say, you know, Weezie was there that night.

A short time later, the prosecutor reiterated that he was "not going to ask any witness up there, Aziz or Conner, about the shooting. All I'm going to ask is was Weezie there that night of the shooting." In response, the trial court ruled that "I am not going to strike [Aziz's] testimony in that narrow area." The trial court made no ruling on whether the show-up was impermissibly suggestive.

At trial, the prosecutor did not ask Aziz whether he witnessed the shooting, but asked him whether he had seen "a person by the name of Weasel come into the store on the night of the crimes." Aziz responded, "I don't know by name." The prosecutor then asked whether Investigator Conner had shown Aziz any photographs and, in particular, whether Conner had shown him a photograph of a person that he identified as Weasel. Aziz responded that he did not remember. During the State's direct examination of Investigator Conner, the prosecutor asked, "what did Abdul Aziz tell you?" Detective Conner testified as follows:

Mr. Aziz told me that he was at work that night of the incident when it occurred. Told me that the witness Patricia Varner, Sweet Meat, was there at the store, along with the victim and another gentleman was there; and there was an argument inside the store and between the victim and the gentleman that we later identified, Mr. Lewis. During the argument, this victim went outside to pump some gas into his car; at which point, Mr. Lewis followed him outside. They had an argument outside and shots rang out. Mr. Lewis shot the victim. The victim ran back towards the store and collapsed in the doorway of the store.

Lewis requested a bench conference, which was not transcribed. After the bench conference, the trial court instructed the jury as follows:

All right. Ladies and gentlemen of the jury, we have had prior hearings on this case, and the testimony that was just elicited from the detective was ruled out of this case, and I'm instructing you, you are not to consider it. I'm sorry that this happened, but I'm instructing you to disregard the last few questions of this detective and his answers; and if you can't do that, please raise your hand. Okay.

After the trial court instructed the jury, defense counsel said that she had a motion to make and that "it needs to be placed on the record in the absence of the jury." The trial court instructed defense counsel to wait until Investigator Conner left the stand. The

27

prosecutor then continued questioning Investigator Conner, who testified that he showed Aziz three individual photographs over the course of three meetings, and that Aziz identified the third photograph—one of Lewis—as being Weasel.

After Investigator Conner finished testifying, the jury was excused from the courtroom, and defense counsel said that she wanted to place on the record that she had moved for a mistrial immediately after Investigator Conner testified about the statement that Aziz had made to him and that the trial court had previously excluded. The State did not object to defense counsel's assertion about having moved for a mistrial. Defense counsel reiterated that a mistrial was appropriate, noting that, at the pre-trial hearing, the prosecutor had represented that he did not intend to present such testimony, and the court had instructed him not to do so. The trial court responded that it had "instructed the [jury] to disregard it. They have indicated that they can. I asked them. Nobody responded when I asked them to raise their hand if they couldn't follow that instruction." The trial court then denied Lewis's motion for mistrial.

(b) Lewis contends that the trial court erred in denying his motion for mistrial. We disagree.

"The decision to grant a mistrial is within the discretion of the trial court and will not be disturbed on appeal unless there is a showing that a mistrial is essential to the preservation of the right to a fair trial." *Perkins v. State*, 313 Ga. 885, 896 (873 SE2d 185) (2022) (citation and punctuation omitted). Moreover, "[i]t is well established that a trial court 'can negate the potentially harmful effect of improperly introduced evidence by prompt curative instructions rather than by granting a mistrial.'" Id. at 897 (quoting *Walker v. State*, 306 Ga. 44, 49 (829 SE2d 121) (2019)). In addition, "juries 'are presumed to follow curative instructions in the absence of proof to the contrary.'" Id. (quoting *Rosser v. State*, 308 Ga. 597, 603 (842 SE2d 821) (2020)). "[A] new trial will not be granted unless it is clear that the trial court's curative instruction failed to eliminate the effect of the prejudicial comment." *Rosser*, 308 Ga. at 603 (citation and punctuation omitted).

Here, the trial court instructed the jury to disregard

Investigator Conner's testimony immediately after it was given and asked the jurors to raise their hands if they felt that they could not follow that instruction. None of the jurors did so. Under these circumstances, we conclude that the trial court did not abuse its discretion in denying Lewis's motion for mistrial. See *Martin v. State*, 310 Ga. 658, 662 (852 SE2d 834) (2020) (holding that the trial court did not abuse its discretion in denying a motion for mistrial where, among other things, the trial court promptly gave a curative instruction and asked the jurors if they understood the instruction and the jurors responded that they did); *Lee v. State*, 306 Ga. 663, 669 (832 SE2d 851) (2019) ("[A] trial court acts within its discretion when it provides adequate curative instructions to the jury to cure any prejudice stemming from the introduction of improper evidence."); *Coleman v. State*, 301 Ga. 720, 722 (804 SE2d 24) (2017) (holding that the trial court did not err in declining to grant a mistrial, in part, because the court promptly gave a curative instruction "telling the jurors that the informant's testimony was inadmissible" and that they should "disregard that evidence in its

30

entirety" and because we "ordinarily presume that a jury follows such instructions").

5. Lewis contends that the trial court erred in denying his motion to suppress evidence of Aziz's identification of him pursuant to the one-person show-up. However, Lewis has not preserved this issue for appellate review. At the pre-trial hearing, Lewis raised the issue that the show-up was impermissibly suggestive and raised a substantial likelihood of misidentification. But during the hearing, the only ruling the trial court made was the one limiting the scope of Aziz's testimony at trial to the subject of Lewis being at the gas station on the night of the shooting. The trial court did not discuss, let alone make any rulings about, whether the show-up was impermissibly suggestive. Because Lewis failed to obtain such a ruling and did not object at trial to evidence about the show-up, he has not preserved the issue for appeal. See *Smith v. State*, 302 Ga. 699, 701 (808 SE2d 692) (2017) (holding that "[b]ecause Appellant did not obtain a ruling on his pre-trial motion to suppress the evidence and did not object to the admission of the evidence at trial,

31

he has not preserved this issue for appellate review").

6. Lewis contends that his trial counsel provided constitutionally ineffective assistance of counsel in three respects. For the reasons explained below, his claims fail.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013). See also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "If an appellant fails to

meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

(a) Lewis claims that counsel was constitutionally deficient because she failed to object during trial to the admission of the photographic lineup that Detective Cooper showed Varner. However, even though counsel did not object to this evidence when it was introduced at trial, she did object to the photographic lineup in a pre-trial motion and preserved this issue for appeal by obtaining a ruling on that motion. See *Whitehead v. State*, 287 Ga. 242, 248 (695 SE2d 255) (2010) (in an old Evidence Code case, explaining that an objection to the admission of evidence that is made and ruled on before trial need not be repeated at trial).[8]  Thus, we cannot say that counsel performed deficiently by failing to object to the evidence at trial, even though she had already raised the issue before trial and

---

[8] Our old Evidence Code is applicable to this case because it was tried before January 1, 2013.  We note that our current Evidence Code provides that "[o]nce the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal."  OCGA § 24-1-103 (a).

33

preserved the issue for appeal. Moreover, as explained above in Division 3, Lewis's claim that the lineup Detective Cooper showed to Varner was impermissibly suggestive is without merit. Accordingly, even if Lewis's trial counsel had failed to preserve this issue, his claim that she was constitutionally deficient for failing to do so would likewise fail. See, e.g., *Reeves v. State*, 309 Ga. 645, 649 (847 SE2d 551) (2020) (holding that because we had held that the defendant's claim that he had a right to be present at bench conferences was without merit, "it follow[ed] that [the defendant could not] show that his trial counsel performed deficiently by failing to assert that right"); *Stroud v. State*, 301 Ga. 807, 813 (804 SE2d 418) (2017) (holding that because we had concluded that there was no error in the trial court's admission of certain evidence, trial counsel did not perform "deficiently in failing to challenge the court's ruling regarding its admissibility").

(b) Lewis contends that trial counsel was constitutionally deficient in failing to object at trial to evidence of the photograph of Lewis that Investigator Conner showed to Aziz, and that this

34

deficiency caused him to suffer prejudice under *Strickland*. As we explained in Division 5, trial counsel filed a pre-trial motion to suppress Aziz's identification of Lewis on the ground that the show-up was impermissibly suggestive and raised a substantial likelihood of misidentification. However, counsel did not obtain a ruling on that motion and did not object to the identification at trial. Lewis has failed to show that an objection to the identification evidence would have been successful, so his claim of ineffective assistance of counsel fails. Specifically, Lewis has failed to show that, even if the show-up was impermissibly suggestive, there was a substantial likelihood of irreparable misidentification. See *Pearson v. State*, 311 Ga. 26, 29 (855 SE2d 606) (2021) (explaining that "evidence of an identification made during such a show[-]up is inadmissible only if the show[-]up procedure was *impermissibly* suggestive *and* there was a substantial likelihood of irreparable misidentification," and that there is therefore no need to decide whether a show-up is impermissibly suggestive if there was no substantial likelihood of irreparable misidentification) (emphasis in original).

35

We consider several factors in evaluating the likelihood of irreparable misidentification, including:

> (1) a witness' opportunity to view the accused at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of accused; (4) the witness' level of certainty at the confrontation; and (5) the length of time between the crime and the confrontation.

*Newton v. State*, 308 Ga. 863, 867 (843 SE2d 857) (2020) (citation omitted). "Moreover, whether the witness knows the defendant is a critical factor in determining the reliability of an identification." *Walker v. State*, 295 Ga. 688, 692 (763 SE2d 704) (2014) (citation and punctuation omitted). "The ultimate question is, whether under the totality of the circumstances, the identification is reliable." *Newton*, 308 Ga. at 867 (citation and punctuation omitted).

Here, the State introduced evidence that Aziz knew Lewis: Aziz initially told Investigator Conner that the person he knew as Weasel had visited the gas station where Printup was shot several times a night for two or three years before Printup's shooting. Moreover, the description that Aziz gave of Weasel as a "light-skinned . . . black

36

male" with tattoos on his face and neck was consistent with the description Varner provided to detectives and with that contained in the CAD report from the night of Printup's shooting. In addition, Aziz told Investigator Connor that the man he knew as Weasel was at the gas station on the night of the crimes; he quickly rejected photographs of three men other than Lewis as being Weasel; and he quickly said, when shown a photograph of Lewis, that the person in the photograph was the person he knew as Weasel. Under the totality of these circumstances, we conclude that Investigator Connor's presentation of a single photograph to Aziz did not create a substantial likelihood of misidentification. See *Newton*, 308 Ga. at 867 (holding that the statement of a witness that he had known the defendant for two years and saw and spoke with him at the crime scene made it "highly unlikely that the photographic array caused [the witness] to misidentify the suspect"); *Pruitt v. State*, 270 Ga. 745, 751-752 (514 SE2d 639) (1999) (holding that there was no substantial likelihood of misidentification because, among other things, the witness testified that she recognized the defendant as a

37

regular customer at her store). And because Lewis has "failed to show that an objection to the identification[] would have been successful, [he] has failed to establish deficient performance by his trial counsel for not securing a ruling" on the identification issue. *Pearson*, 311 Ga. at 31 (citation and punctuation omitted).

(c) Lewis contends that his trial counsel was constitutionally deficient when she failed to object to the State's reference to the contents of the CAD report in its closing argument. Lewis argues that counsel "missed an opportunity to have a mistrial," contending that the CAD report was not introduced into evidence at trial and that the State's closing argument was therefore objectionable. However, the record shows that the CAD report was admitted into evidence. Thus, counsel was not deficient for failing to object to the prosecutor's reference to a report that had been admitted into evidence. See *Williams v. Harvey*, 311 Ga. 439, 445 (858 SE2d 479) (2021) ("[C]losing argument must be based on the evidence presented at trial.") (citation and punctuation omitted); *Ward v. State*, 313 Ga. 265, 273 (869 SE2d 470) (2022) ("Failure to make a

38

meritless objection cannot be considered deficient or prejudicial.")

(citation and punctuation omitted).

*Judgment affirmed. All the Justices concur.*