318 Ga. 681
FINAL COPY

S24A0105. HOWARD v. THE STATE.

PETERSON, Presiding Justice.

Marquavious Howard appeals his felony murder conviction for

the 2017 shooting death of Jacorbin King.[1] Howard argues that (1)

the evidence was insufficient to sustain his convictions, (2) his trial

---

[1] The victim's first name was spelled "Jakorbin" in the indictment but "Jacorbin" in the trial transcript and the District Attorney's brief on appeal. King was shot and killed on the morning of April 30, 2017. On January 30, 2018, a Muscogee County grand jury returned an indictment charging Howard with malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), and possession of a firearm during the commission of a felony (Count 4). Four others — Jylonda Jones, Samuel Jones, Tyler Teal, and Tramal Williams — were also charged with Counts 1-3, and Samuel Jones, Tyler Teal, and Tramal Williams were charged with other crimes, as well. Tramal Williams testified at Howard's trial that he expected his case to be transferred to juvenile court, while Howard's other three co-defendants pleaded guilty to charges less than murder. At a trial held in May 2018, a jury found Howard not guilty of malice murder or the firearm count, but guilty of felony murder and aggravated assault. The trial court sentenced Howard to life with the possibility of parole for felony murder; the aggravated assault count merged. Howard filed a timely motion for new trial that was amended by appellate counsel. Following a hearing, the trial court denied the motion in an order entered on May 23, 2022. Howard filed a notice of appeal on June 22, 2022. Because the record transmitted to this Court was incomplete, the appeal was stricken from the docket on April 19, 2023. Upon transmission of a more complete record, the case was re-docketed to this Court's term beginning in December 2023 and submitted for consideration on the briefs.

counsel was ineffective for failing to file a motion to suppress evidence of a photo identification, and (3) the trial court erred in excusing a juror for cause. We conclude that (1) the evidence was sufficient, (2) Howard has not shown that counsel performed deficiently in failing to move to suppress evidence of the photo identification, and (3) Howard's juror claim fails because he has not shown that the selected jury was biased or incompetent. We therefore affirm.

The evidence at trial showed as follows. On the night of April 29, 2017, a group of teenagers, including Tramal Williams ("Tramal"), Samuel Jones ("Sam"), and Tyler Teal, went to King's Muscogee County apartment, planning to steal marijuana. Teal carried a BB gun, and Sam carried his father's firearm. At the apartment, Tramal grabbed the marijuana and began to run out, causing a fight that spilled out into the hallway. During the scuffle, Sam fell down a stairwell and lost some belongings, including his father's gun.

Agitated about losing the items, Sam began making phone

calls, asking for another gun and threatening to kill someone. Sam called his older sister, Jylonda Jones ("Jylonda"), who lived in Hoover, Alabama, and asked for her help; she agreed to come pick him up and asked her 21-year-old boyfriend, Howard, to accompany her on the approximately two-and-a-half-hour drive. On the morning of April 30, 2017, Jylonda and Howard picked up Tramal, Sam, and Teal in a white Toyota Camry and drove to King's apartment. Everyone went inside except for Jylonda. The group initially came back to the car after being unable to find Sam's belongings, but then went back in a few minutes later after Howard noted a bedroom door had been locked. After the group re-entered the apartment, King emerged from behind the locked bedroom door, a struggle ensued, and Howard shot King multiple times.

Tramal testified that he saw Howard with a firearm magazine on the morning of the shooting. Tramal testified that King "barged out into" Howard when King came out of the bedroom, then Tramal heard gunshots as he ran out of the apartment building.

Sam testified that he saw Howard with a handgun just before

3

the group entered King's apartment for the last time. Sam testified that Teal became entangled with King when King "bust out of the [bed]room[,]" and King made contact with Howard's person, with King "go[ing] for [Howard's] mouth area." Sam testified that he pulled Teal off of King, then heard shots as he and Teal ran out of the apartment.

Teal testified that he heard one shot while he was trying to break up a fight between Howard and King, then ran away. Teal testified that Howard was the only other member of their group who was in the apartment when the victim was shot. Teal testified that he did not see Howard with a gun but saw him clutching his pants in such a manner that he could have been holding one.

Jylonda testified that she knew Howard to have a weapon generally. Sam, Teal, and Tramal all testified that none of the three of them had a firearm in the apartment on the morning of the shooting.

A neighbor who heard the shooting, Rodrell Williams, saw the group entering and leaving the apartment building. The neighbor

4

said a person matching Howard's description was carrying a weapon, and was accompanied by three others who looked like "little kids." Rodrell's wife called 911 around 7:00 a.m. and testified that she heard gunshots while she was on that call.

Surveillance video capturing the area adjacent to King's apartment building showed the arrival of a white sedan on the morning of April 30, 2017, then a group of four young men twice walking away from, then running back toward, the car. In their trial testimony, Jylonda, Sam, and Tramal identified Howard on the surveillance video as being part of the group.

A jail bunkmate of Howard, Merrick Redding, testified that Howard confessed to shooting King. According to Redding, Howard told him that he rode to Columbus with his girlfriend to retrieve her brother, then went to King's apartment to retrieve a gun, shoe, and glasses that had been lost in a botched robbery, and that when King burst through a locked door, Howard shot him multiple times with a .40-caliber, FN-brand pistol. Redding reported that Howard told him that King and Teal had tussled, and King hit Howard in the

5

mouth. According to Redding, Howard first shot King in the side, then fired more shots as King was falling, then finally, because Howard was upset about being hit in the mouth, Howard shot King in the head, firing a total of four to six shots.

A firearms expert testified that the shell casings recovered from the scene were consistent with having been fired by, among other possible types of guns, a .40-caliber FN handgun and had all been ejected from the same firearm. The expert also testified that bullets recovered from the scene, as well as two bullets recovered from King's body, were consistent with having been fired by a .40-caliber FN handgun and had all been fired from the same firearm. The autopsy of King revealed four gunshot wounds, one in the head and three in the abdomen or torso, with at least one indicating a bullet entered the left side of the victim. The medical examiner testified that the distance between King and the gun when it was discharged could not be determined.

1. Howard first argues that the evidence was insufficient to support his felony murder conviction. We disagree.

When evaluating the legal sufficiency of evidence, we view the evidence in the light most favorable to the verdicts and inquire whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Mims v. State*, 304 Ga. 851, 853 (1) (a) (823 SE2d 325) (2019) (citation and punctuation omitted).

To support Howard's conviction for felony murder, the evidence presented at trial had to show that he caused King's death while in the commission of an aggravated assault with a deadly weapon. See OCGA § 16-5-1 (c). The relevant portion of Georgia's aggravated assault statute requires the prosecution to show that a defendant committed assault "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" OCGA

7

§ 16-5-21 (a) (2). The crime of assault in Georgia requires that the defendant "[a]ttempt[ed] to commit a violent injury to the person of another; or . . . [c]ommit[ted] an act which place[d] another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a). A jury may find a defendant guilty beyond a reasonable doubt if the evidence shows either that he directly committed the crime or that he was a "party thereto." OCGA § 16-2-20 (a). And a jury may infer a defendant's criminal intent, and thereby find him guilty as a party to a crime, "from his presence, companionship, and conduct before, during, and after the offense." *Willis v. State*, 315 Ga. 19, 24 (2) (880 SE2d 158) (2022) (citation and punctuation omitted).

Howard appears to argue that the evidence (1) was insufficient to show that he directly committed felony murder, because the evidence did not show that he shot King, and (2) was insufficient to support his conviction on a party-to-the-crime theory, given a lack of evidence that the group that entered King's apartment the morning of the shooting planned anything other than retrieving a weapon.

8

Howard does not challenge the evidence showing that he was in King's apartment when King was shot, instead arguing that the evidence was "insufficient to prove anything other than Howard was merely present at the scene[.]" But there was ample evidence showing that he was the person who shot Howard. Tramal, Sam, and Teal all testified that none of the three had a firearm, and they all testified that they either saw Howard with a gun or that he appeared to have one. This testimony was supported by the testimony of King's neighbor that he saw someone matching Howard's description carrying a gun. Teal also testified that Howard was the only other member of their group who was in the apartment when he heard King being shot. Moreover, Howard admitted to a jail bunkmate that he shot King in the head and torso with a .40-caliber FN pistol. And that account by the jail bunkmate was corroborated by ballistics evidence consistent with King having been shot with a .40-caliber FN handgun and autopsy findings that King was shot in the head and torso.

Howard also appears to suggest that the evidence was

insufficient to show that he shot King because the jury necessarily found that he was not the shooter when the jury found him not guilty of the firearm possession count. But an acquittal on one count is not itself a basis to challenge the sufficiency of the evidence as to another count. See *Kolokouris v. State*, 271 Ga. 597, 598 (2) (523 SE2d 311) (1999); see also *McElrath v. State*, 308 Ga. 104, 108-109 (2) (a) (839 SE2d 573) (2020) (noting abolition of rule that inconsistent verdicts warrant reversal).

Although Howard suggests that the evidence was insufficient to show that he had the requisite intent to be guilty of the crime of conviction, "[f]elony murder requires only that the defendant possessed the requisite criminal intent to commit the underlying felony — in this case, aggravated assault, which also does not require intent to kill." *Mathews v. State*, 314 Ga. 360, 365 (1) (877 SE2d 188) (2022) (citation and punctuation omitted). And the jury could infer that Howard himself had the intent to injure King violently when he shot at him multiple times, including in the head. Howard has not shown that the evidence was insufficient to sustain

his conviction.

2. Howard next argues that trial counsel was ineffective for failing to file a motion to suppress evidence of a photo identification of him by Tramal that Howard argues was based on an impermissibly suggestive process. We disagree.

As memorialized in a video recording that is part of the record, Tramal was shown a group of individual photos during an interview by investigators. He indicated, with some uncertainty, that one of the photos looked like Sam's sister's boyfriend, whom he knew as "Quay" and had not met prior to the morning of the shooting. Later in the interview, Tramal was shown what appeared to be a one-page photo array of six headshots, and definitively selected one of the photos as "Quay," stating affirmatively that he was sure it was him. A detective who interviewed Tramal and was present for the photo array presentations explained in his trial testimony that the initial group of photos was taken from photos posted on Facebook, whereas the second array included a driver's license photo of Howard.

During Tramal's trial testimony, both the individual photos

(State's Exhibit 71) and the one-page photo array (State's Exhibit 72) were admitted without objection. But when the State attempted to publish to the jury the individual photos that comprised Exhibit 71 after their admission, Howard's trial counsel moved for a mistrial on the basis that, although he thought at the time they were admitted that the photos had been provided in discovery, counsel in fact had "never seen these pictures before[,]" and a photo of Howard placed Howard's character in question because the photo showed him making gang signs and holding cash, which counsel said suggested Howard was a drug dealer. The prosecutor represented that the photos had been provided in discovery and shown to defense counsel just prior to Tramal identifying them for admission. The prosecutor said that although the photo of Howard showed him with "large amounts of money in his hand[,]" it did not show him making gang signs, and that the purpose of the photo was to demonstrate how Howard was identified during the interview. The trial court denied the motion for a mistrial but indicated "that particular exhibit" — specifically referencing "71C" — would not go out with

the jury, which defense counsel agreed "satisf[ied his] concern."

Tramal later testified without objection that he picked Howard out of the photo array that was admitted as Exhibit 72. The detective who interviewed Tramal also testified about Tramal picking Howard's photo out of an array as Jylonda's boyfriend. The detective acknowledged in his testimony that in viewing the original array, Tramal said that he was not sure of his identification of Howard; the detective noted that a hat Howard was wearing in the picture left a shadow on his face. The State played portions of the video recorded interview of Tramal for the jury, although the transcript is not precise as to which portions.

Tramal also identified Howard in court as Jylonda's boyfriend, the person he knew as "Quay." In his trial testimony, Tramal also identified Howard on the video surveillance footage from outside of King's apartment. Tramal described riding in the car with Howard both before and after the shooting, saying the ride to King's residence took at least 30 minutes. The video appears to show that the sun had begun to rise before the group arrived at the apartment

building.

Howard argues that trial counsel was ineffective when counsel "failed to file a motion to suppress the photo lineup" because the identification procedure used by the detective when interrogating Tramal was impermissibly suggestive.[2] To prove his claim of ineffective assistance of counsel, Howard must show that counsel's performance was deficient and that counsel's deficient performance prejudiced Howard's defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "If [a defendant] fails to establish one of these two prongs, we need not examine the

---

[2] To the extent that Howard made below separate arguments that counsel was ineffective for failing to review any particular photo prior to trial or failing to object promptly to their admission into evidence, he has abandoned those arguments on appeal. Although he mentions those arguments in his brief to this Court, he enumerates as error on appeal only that counsel was ineffective for failing to "file a motion to suppress the photo lineup." This is insufficient to raise any such additional claims of ineffective assistance of counsel for our review. See *Mims v. State*, 310 Ga. 853, 854 n.2 (854 SE2d 742) (2021) ("An appealing party may not use its brief to expand its enumeration of errors by arguing the incorrectness of a trial court ruling not mentioned in the enumeration of errors." (citation and punctuation omitted)). Moreover, because he makes no substantive argument or citation of authority regarding trial counsel's alleged deficiencies in this regard, we would not address such claims of ineffectiveness even if they were contained in his enumerations of error. See former Supreme Court Rule 22; *Session v. State*, 316 Ga. 179, 185 (2) (887 SE2d 317) (2023).

other." *Payne v. State*, 314 Ga. 322, 328 (3) (877 SE2d 202) (2022) (citation and punctuation omitted). "To show deficient performance, the defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." Id. at 328-329 (3) (citation omitted). "To establish prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. at 329 (3) (citation and punctuation omitted). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." Id. (citation and punctuation omitted).

When a defendant claims that his counsel was ineffective for failing to file a motion to suppress evidence, he cannot show that his counsel performed deficiently unless he can show that the motion would have been granted. See *Armour v. State*, 290 Ga. 553, 554-555 (2) (a) (722 SE2d 751) (2012) (appellant failed to establish deficient

15

performance where he failed to show that an objection to certain eyewitness identifications of him during photo arrays would have been sustained). A motion to suppress an out-of-court identification by a witness as impermissibly suggestive in violation of due process — the motion that Howard contends his counsel should have filed — requires a showing that the identification was "so impermissibly suggestive that it could result in a substantial likelihood of misidentification[.]" *Lewis v. State*, 314 Ga. 654, 662 (3) (b) (878 SE2d 467) (2022) (citation and punctuation omitted). We employ a two-step process to determine whether identification evidence meets that test. See id. "First, we decide whether the identification procedure used was impermissibly suggestive." Id. (citation and punctuation omitted). "Second, if a trial court properly concludes that the State employed an impermissibly suggestive pre-trial identification procedure, the issue becomes whether, considering the totality of the circumstances, there was a substantial likelihood of irreparable misidentification." Id. (citation and punctuation omitted). "If, however, a trial court properly determines that the

16

identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification." Id. (citation and punctuation omitted).

Here, whether or not the photo identification procedure used with Tramal was impermissibly suggestive, we conclude that Howard has not shown that there was a substantial likelihood of irreparable misidentification, such that a motion to suppress the photo identification evidence would have succeeded. See *Newton v. State*, 308 Ga. 863, 863, 867 (2) (843 SE2d 857) (2020) (concluding that, even assuming photo array was impermissibly suggestive, defendant had not shown a substantial likelihood of irreparable misidentification, and thus trial court did not err in denying motion to suppress). In evaluating the likelihood of irreparable misidentification, a court considers whether, under the totality of the circumstances, the identification is reliable. See id. at 867 (2). Factors to consider include (1) a witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the accused; (4)

17

the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the confrontation. See id.

Here, Howard argues that because Tramal had not met him prior to the day of the shooting, the likelihood of misidentification was higher. But Howard does not grapple with the evidence showing that Tramal had a significant opportunity to view him before and after the shooting. As noted above, Howard and Tramal rode together in a car both before and after the shooting, a journey that was at least 30 minutes each way. As demonstrated by the surveillance video, Tramal would have had the opportunity to view Howard in daylight at least by the time that they arrived at King's apartment. Tramal and Howard also went into King's apartment twice together. And Tramal expressed certainty in identifying Howard in the second, one-page photo array. The extensive opportunities for Tramal to view Howard, as well as the certainty with which he ultimately identified Howard, greatly lessened the likelihood that any suggestiveness in the initial photo array influenced the reliability of Tramal's subsequent identifications of

18

Howard. See *Curry v. State*, 305 Ga. 73, 77 (2) (823 SE2d 758) (2019) (despite trial court's conclusion that State employed an impermissibly suggestive pretrial identification procedure with bystander witnesses, no abuse of discretion in overruling objection to identification evidence, given factors such as witnesses' "adequate opportunity in full daylight" to view the defendant and high level of certainty of identifications at the time of trial); *Wright v. State*, 294 Ga. 798, 800, 802-803 (2) (756 SE2d 513) (2014) (rejecting argument that in-court identification should have been excluded for substantial likelihood of irreparable misidentification, even though witness had not seen the shooter prior to the night of the shooting and was unable to select defendant definitively from photo array, where witness had sufficient opportunity to observe shooter, gave fairly accurate description of gunman, and testified that he was 95 percent certain of his identification). And although Tramal was hesitant about identifying Howard in the initial photo array, the uncontested evidence is that Howard was wearing a hat that cast a shadow on his face in this photo, both explaining Tramal's hesitance

19

about identifying him from that photo and making it less likely that the viewing of this photo influenced Tramal's subsequent, more certain identifications of Howard. Having failed to show that an objection to Tramal's identification of Howard would have been successful, Howard has failed to establish deficient performance by his trial counsel for not filing a motion to suppress, so Howard's claim fails on the first prong of the ineffective assistance test. See *Pearson v. State*, 311 Ga. 26, 29-31 (2) (855 SE2d 606) (2021) (no deficient performance in failing to secure ruling on motion to suppress identifications where totality of the circumstances did not show that the trial court would have found a substantial likelihood of misidentification); see also *Walker v. State*, 295 Ga. 688, 692-693 (3) (763 SE2d 704) (2014) (equating the admissibility of in-court identification with whether suggestive out-of-court identification leads to a substantial likelihood of irreparable misidentification).

3. Finally, Howard argues that the trial court erred in striking a prospective juror for cause. We conclude that Howard has not shown reversible error.

During voir dire, in response to the State's question of whether any member of the panel "may have some moral or religious or philosophical beliefs that would prevent you from sitting in judgment of another person," Juror No. 18 said she did not "feel comfortable judging" and did not "feel comfortable making the judgment on someone else's situation." She added, "I just feel like I pray that — for everyone and I just think that God is going to make everybody better. But it doesn't always happen that way, but I still pray for them." During follow-up questioning, Juror No. 18 stated that she would follow the trial court's instructions, "listen to all the evidence[,] and follow what the [j]udge told [her] to do[,]" and she told the prosecutor that if she "fe[lt] that [the] evidence [was] strong enough, then it would have to be a guilty verdict." But she also expressed concern about "holding the young man's life in [her] hands[,]" noting she had five grandsons. And when the prosecutor pressed her on whether she could "set aside" her "moral belief" and thoughts about her grandsons and "decide this case without all of that influencing [her,]" Juror No. 18 responded, "I don't think I could

21

do that. I really don't." The State moved to strike Juror No. 18 for cause. Howard's counsel responded that the prospective juror should not be struck, noting her statements that she would follow instructions and vote guilty if the evidence were strong enough. The State argued in turn that "her initial response and her final response clearly indicates that she has so much compassion and cannot set aside her moral convictions[.]" The trial court granted the State's motion to strike, saying, "I'm kind of falling back on primacy and recency on this one." Howard did not further object to the striking of the juror.[3]

Whether or not the trial court abused its discretion in striking Juror No. 18, Howard's claim provides no grounds for reversal. "It is well settled that a defendant does not have a right in a particular

---

[3] The Attorney General argues that this claim is not preserved. But the cases that the Attorney General cites do not address whether a defendant needs to re-state an objection to excusing a juror for cause once the court has ruled. See *Hill v. State*, 310 Ga. 180, 186-187 (3) (a) (850 SE2d 110) (2020); *Passmore v. State*, 274 Ga. 200, 202 (5) (552 SE2d 816) (2001). And our precedent indicates that a defendant does not need to re-state such an objection. See *Humphreys v. State*, 287 Ga. 63, 69 (4) (694 SE2d 316) (2010), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706-707 (11) (a) n.3 (820 SE2d 640) (2018).

juror but rather only has a right to a legal and impartial jury[.]" *Saylor v. State*, 316 Ga. 225, 232-233 (3) (887 SE2d 329) (2023). The erroneous dismissal for cause of a prospective juror for a reason that is not constitutionally impermissible does not require reversal "if there is no showing that a competent and unbiased jury was not selected." Id. at 233 (3). Howard does not argue that the jury that was selected was biased or incompetent. Accordingly, his claim fails.

*Judgment affirmed. All the Justices concur.*

Decided March 19, 2024.

Murder. Muscogee Superior Court. Before Judge McBride.

*Angela B. Dillon*, for appellant.

*Stacey S. Jackson, District Attorney, Gary D. Bergman, Tina G. Stanford, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Michael A. Oldham, Clint C. Malcolm, Senior Assistant Attorneys General*, for appellee.