308 Ga. 863
FINAL COPY

S20A0259. NEWTON v. THE STATE.

BLACKWELL, Justice.

Cedric Newton, Jr., was tried by a Bibb County jury and convicted of murder and other crimes in connection with the fatal shooting of Udondra Hargrove. On appeal, Newton claims that the trial court erred when it denied his motion to suppress evidence of two out-of-court identifications. He also contends that he was denied the effective assistance of counsel at trial. Finding no error, we affirm.[1]

---

[1] Hargrove was killed on October 8, 2010. On April 1, 2014, a Bibb County grand jury indicted Newton, charging him with murder with malice aforethought, two counts of murder in the commission of a felony, possession of a firearm by a convicted felon, possession of a firearm during the commission of a felony, and two counts of violating the Street Gang Terrorism and Prevention Act. Newton was tried in April 2014, and a jury found him guilty on all counts. The trial court sentenced Newton to imprisonment for life without the possibility of parole for malice murder, a consecutive term of imprisonment for five years for possession of a firearm during the commission of a felony, and a consecutive term of imprisonment for fifteen years for one Street Gang Act count. The other counts merged or were vacated by operation of law. Although it appears that the trial court erred when it merged the felon-in-possession count with one of the felony murder counts, see Atkinson v. State,

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows the following. Newton—who was also known as "Little G" — was a member of the "Mafia," a criminal street gang. Hargrove — who was also known as "Duck" — was an inactive member of the "Crips," a rival gang. The Mafia and the Crips had been feuding since the 1980s, and Montpelier Avenue in Macon was the "front line" dividing the territories that the gangs claimed. Around 9:00 on the evening of October 8, 2010, Hargrove was fatally shot on the corner of Montpelier and Pansy Avenues, on the side of the street claimed by the Crips, near Dusty's pool hall.[2]

Alvin Wright was a life-long friend of Hargrove and had known Newton since 2007. On the evening of October 8, Wright was sitting

---

301 Ga. 518, 520 (2) (801 SE2d 833) (2017), this merger error benefits Newton, and the State has not raised it by cross-appeal, so we decline to correct the error. See Dixon v. State, 302 Ga. 691, 698 (4) (808 SE2d 696) (2017). Newton filed a motion for new trial in April 2014, which he amended for the final time in December 2018. After a hearing, the trial court denied his motion for new trial on December 19, 2018. Newton timely appealed, and this case was docketed to the term of this Court beginning in December 2019 and submitted for a decision on the briefs.

[2] An autopsy revealed that Hargrove died as a result of four gunshot wounds: two in the back, one in the forearm, and one in the thigh.

in front of Dusty's, smoking a cigarette. Around 9:00, Wright saw Newton walking across the street, dressed in all black, with his hands in his pockets. Wright said, "Hey, Little G," and Newton nodded back. Wright described Newton as a "light-skinned guy" with dreadlocks and a tear-drop tattoo that extended from his eye to his lip, down the entire side of his face.

After Newton walked past Dusty's, Wright heard several gunshots. He also heard a woman he knew, Gloria Redding, exclaim, "Duck done got shot. Duck done got shot." Wright ran into Dusty's, and when he came back out, he saw Hargrove "crawling like around the corner with his hand extended out . . . like he was trying to reach out for help. . . . And the next thing I know, his eyes closed." Wright testified that there was no one at the intersection except Redding, Hargrove, and Newton. A few days after the shooting, Wright identified Newton in a photographic lineup as the person he believed was the shooter.

Redding did not testify because she died before trial. But two officers testified about the statements she made to the police at the

scene of the shooting. Redding told the police that, as she was walking with Hargrove to the gas station, a black man walked past them. He was wearing all-black clothes, including a hoodie, and had a tear-drop tattoo under his right eye. As the man walked past, Redding heard three or four shots, and Hargrove fell. The man then ran across Montpelier Avenue.

Another witness, Kelvin Middleton, was sitting in a parked car near the intersection of Montpelier and Pansy when he heard four gunshots. He looked toward Dusty's and saw a man running with a gun in his hand. Middleton testified that the man was wearing black clothing and had a "long dark spot" or "long mark" on the side of his face that stretched from his eye to his lip. Middleton identified Newton in a photographic lineup as the man he saw that night.

The day after the shooting, three police investigators visited Newton's residence to talk to him, not intending at the time to arrest him. But when Newton opened the door and saw the officers, he spontaneously said, "That's all you-all got?" When the officers asked

what he meant, Newton responded, "I thought you-all were gonna bring the SWAT team."

A jailhouse informant testified that he overheard Newton talking to other Mafia gang members about the case. The informant heard Newton saying, "Yeah, but the witness description doesn't really match me. . . . The witness described a darker skinned male with a small tattoo under his eye. . . . I'm gonna get away with this s**t because I'm lighter skinned and I have big tattoos on my face." On cross-examination, the informant added that Newton also said, "I opened fire. I didn't waste no time shooting that n****r."

In addition to the foregoing, the State presented evidence that Hargrove's killing was gang-related. This evidence included the testimony of a former prison officer that, in July 2009 (before Hargrove's death), Newton was interviewed at the Valdosta State Prison about his gang affiliation as part of the prison security process. Newton told the interviewing officer that he was a member of the Mafia and that his role in the gang was the "shooter." Newton said he joined the gang to earn money, power, and respect, and he

also said that the Crips were enemies of the Mafia. Furthermore, as part of a separate investigation, the police discovered a photograph of Newton in the cell phone of a known Mafia member. That photograph depicted Newton holding a gun and making a "CK" sign with his hand, which a gang expert testified stands for "Crip killer." The day that Hargrove was shot, October 8, was the Mafia leader's birthday.

Newton does not dispute that the evidence is sufficient to sustain his convictions. But consistent with our usual practice in murder cases, we independently have reviewed the record to assess the legal sufficiency of the evidence. We conclude that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Newton was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Newton contends that the trial court erred when it denied his motion to suppress the out-of-court identifications made by

Wright and Middleton using a photographic lineup. Evidence of an out-of-court identification violates due process and is inadmissible at trial if the identification procedure is "so impermissibly suggestive that it could result in a substantial likelihood of misidentification." Blackmon v. State, 300 Ga. 35, 37 (3) (793 SE2d 69) (2016) (citation and punctuation omitted). An identification procedure is unduly suggestive when it "leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is equivalent to the authorities telling the witness, 'This is our suspect.'" Williams v. State, 286 Ga. 884, 888 (4) (b) (692 SE2d 374) (2010) (citation and punctuation omitted). "Where the identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification." Id. "We review a trial court's determination that a lineup was not impermissibly suggestive for an abuse of discretion." Westbrook v. State, 308 Ga. 92, 99 (4) (839 SE2d 620) (2020).

Here, the out-of-court identifications by Wright and Middleton

were based on the same photographic array containing six pictures. The trial court denied Newton's motion to suppress on the ground that the array was not unduly suggestive. Newton challenges that determination, arguing that the array is impermissibly suggestive because his photograph differs significantly from the other photographs in the array. More specifically, he asserts that his photograph shows a more magnified close-up view of his face, bringing inordinate attention to his facial tattoos; that his skin tone is light in comparison with the other subjects; and that his clothing cannot be seen at all, while the others are dressed differently.

It is true that the photograph of Newton looks different than the others — it is a close-up shot, omitting the chin and the top of the head. But we do not believe this aspect of the photograph invites the witness to pick Newton out of the lineup. The cropped picture of Newton's face appears to be of poorer quality than most of the other photographs, which display all of the subjects' facial features. Moreover, another picture in the array also differs significantly from the others, showing a shirtless man from the waist up. One can

discern some facial tattoos on Newton's face on the photograph, but they are not particularly clear, and, according to the testimony at the suppression hearing, at least two other subjects in the array have facial tattoos.[3] And variations in the skin tones of the subjects depicted in the array appear to be slight. Looking at the array as a whole, Newton's photograph does not jump out as that of the obvious suspect, and so the trial court did not abuse its discretion when it found that the array was not impermissibly suggestive. See Marshall v. State, 285 Ga. 351, 352 (2) (676 SE2d 201) (2009) ("The fact that defendant's photograph was the only one depicting a gold necklace did not make the photographic line-up unduly suggestive."); Waters v. State, 281 Ga. 119, 120 (2) (636 SE2d 538) (2006) (although defendant contended that "the color of his shirt, position of his head, and complexion in his photograph were different from the other photos" in the lineup, "he failed to show how

---

[3] The photographic array produced along with the record on appeal is a black-and-white copy (and not a good one) of the actual color array used for the lineup, so it is difficult for us to discern anyone's facial tattoos or skin tone. See Ware v. State, 279 Ga. 17, 18 (2) (608 SE2d 643) (2005) ("An appellant has the burden of proving trial court error by the appellate record.").

these differences would render [the] lineup unduly suggestive");

Miller v. State, 270 Ga. 741, 743 (2) (512 SE2d 272) (1999) (lineup was not impermissibly suggestive where the perpetrator was an inch or two shorter than other participants and was only one of two participants with facial hair).[4]

Even assuming that the photographic array was unduly suggestive, Newton fails to show that there was a substantial likelihood of irreparable misidentification. In evaluating the likelihood of irreparable misidentification, a court considers several factors, including:

> (1) a witness' opportunity to view the accused at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of accused; (4) the witness' level of certainty at the confrontation; and (5) the length of time between the crime and the confrontation.

Mathis v. State, 293 Ga. 837, 842 (5) (750 SE2d 308) (2013). "The ultimate question is, whether under the totality of the

---

[4] Newton does not argue (and the evidence does not indicate) that the conduct of the police or other circumstances apart from the photographic array made the lineup procedure unduly suggestive.

circumstances, the identification is reliable." <u>McBride v. State</u>, 291 Ga. 593, 595 (2) (732 SE2d 757) (2012) (citation and punctuation omitted).

With respect to the out-of-court identification by Wright, he testified that he knew Newton for two years prior to the shooting, that he greeted Newton by name ("Little G") when he saw him near Dusty's that night, and that Newton acknowledged his greeting. It is thus clear that Wright believed he saw Newton that night, so it is highly unlikely that the photographic array caused Wright to misidentify the suspect. As to Middleton, Newton points out that it was dark outside when Hargrove was shot, that Middleton was across the street from the scene, and that he saw only a side profile view of the suspect. Even so, Middleton made the identification only six days after observing the suspect, and he testified that he had "no doubt" that it was the man he saw. We cannot say, under the totality of the circumstances, that Middleton's identification was unreliable, and so Newton has not shown a substantial likelihood of irreparable misidentification. See <u>Mathis</u>, 293 Ga. at 842 (5) (finding no

substantial likelihood of irreparable misidentification, in part because the witnesses "identified appellant within weeks of the crime" and identified him "from the photographic array with certainty"). See also Padilla v. State, 273 Ga. 553, 554 (1) (544 SE2d 147) (2001).

3. Newton argues that he was denied the effective assistance of counsel at trial. To obtain relief on a claim of ineffective assistance of counsel, a defendant generally must show both that his lawyer's performance was deficient and that this deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). An attorney performs deficiently under Strickland if he discharges his responsibilities at trial in an "objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Thomas v. State, 303 Ga. 700, 702 (2) (814 SE2d 692) (2018) (citation and punctuation omitted). Prejudice is shown by demonstrating "a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the

result of the proceeding would have been different." Miller v. State, 285 Ga. 285, 286 (676 SE2d 173) (2009) (citation and punctuation omitted). "If either Strickland prong is not met, this Court need not examine the other prong." Palmer v. State, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

(a) Newton contends that he was denied the effective assistance of counsel when his lawyer failed to object to an officer testifying about Wright's out-of-court identification of Newton. During the direct examination of the officer, the prosecutor asked about the photographic lineup presented to Wright, and the following exchange occurred:

> Q: . . . Did [Wright] indicate that he recognized Mr. Newton?
> A: Yes.
> Q: And did he indicate how he recognized him?
> A: Yes.
> Q: And what did he say?
> A: He indicated that this is the person *that he witnessed shoot his friend up*.

(Emphasis supplied.) Newton argues that the officer's testimony about Wright witnessing Newton "shoot his friend up" was

prejudicial and that his lawyer should have objected to it.

Pretermitting whether the officer's answer was objectionable, Newton has failed to show prejudice under Strickland. Wright testified unambiguously that he did not see the actual shooting, and there is no reason to think the jury gave more weight to his pre-trial statement — as recounted by the officer — than to his live testimony at trial. At the same time, Wright's testimony strongly implies that Newton was the shooter — it shows that Newton was the only person in the vicinity who could have shot Hargrove. So, it should have come as no surprise that Wright actually believed Newton to be the shooter based on things that Wright had seen and heard, which explains his statement to the officer. Given Wright's testimony and the other strong evidence of Newton's guilt, there is no reasonable probability that the officer's statement affected the outcome of the trial. See Strickland, 466 U.S. at 694 (III) (B).

(b) Newton additionally contends that his trial lawyer was constitutionally ineffective when he failed to introduce evidence of a recorded statement that Redding had given to a detective. The

record shows that Redding made three statements to law enforcement officers in which she described the assailant's appearance. She made the first statement to an officer at the scene, who testified at trial that Redding described the suspect as a "black man" with a tear-drop tattoo under his right eye. The second statement was to another officer (also at the scene), who testified that Redding described the assailant as having "large tattoos" and that she made a "hand gesture down her face." The third statement was made to a detective at the police station, in which Redding described the assailant as "dark-skinned" with a "tear-drops" tattoo under his right eye.[5]

Newton argues that his trial lawyer should have presented evidence of Redding's statement to the detective because, he says, that statement is inconsistent with other evidence and has exculpatory value. Specifically, Newton asserts, Redding's description of the suspect as "dark-skinned" is inconsistent with

---

[5] The recording of Redding's statement to the detective is not in the record, but the parties do not dispute the relevant contents of that statement.

evidence that Newton was light-skinned. And, he says, Redding's statement to the detective that the suspect had a "tear-drops" tattoo is inconsistent with her statement at the crime scene that the suspect had "large tattoos" on his face. We disagree with Newton's assessment of this evidence.

Redding's statement to the detective strikes us as more incriminating than exculpatory. She described the suspect as having a "tear-drops" tattoo, which was his main identifying feature. This description does not imply that he had only one small tattoo on his face, so it is consistent with other descriptions of the suspect. And, even if Redding's additional description of the suspect as "dark-skinned" actually was inconsistent with other descriptions, the incriminating nature of her statement that the suspect had a "tear-drops" tattoo likely outweighed any exculpatory value of the "dark-skinned" description. Newton's trial lawyer acted reasonably when he attempted to exclude Redding's incriminating statement to the

detective, rather than seeking the admission of that statement.[6] Furthermore, given the non-exculpatory nature of Redding's statement, Newton has failed to show <u>Strickland</u> prejudice — that if the statement had been admitted into evidence, there is a reasonable probability that the outcome of the trial would have been different. See <u>Strickland</u>, 466 U.S. at 694 (III) (B). Accordingly, Newton has failed to establish ineffective assistance of counsel, and we affirm.

<u>Judgment affirmed. All the Justices concur</u>.

DECIDED JUNE 1, 2020.
Murder. Bibb Superior Court. Before Judge Simms.
*David J. Walker*, for appellant.
*K. David Cooke, Jr., District Attorney, Dorothy V. Hull, Neil A. Halvorson, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.

---

[6] Newton does not suggest that his lawyer could have introduced only one part of Redding's statement to the detective, while having the other part excluded. See generally <u>Allaben v. State</u>, 299 Ga. 253, 256 (2) (787 SE2d 711) (2016) (pursuant to the "rule of completeness," if "part of a conversation is introduced, all that is said in the same conversation which is relevant to the issue should be admitted" (citation and punctuation omitted)).